UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,　　　　　　　　　　CRIMINAL NO. 18-20310

v.　　　　　　　　　　　　　　　　HON. ARTHUR J. TARNOW

DAMARIO DAVON TUBBS-SMITH,

    Defendant.
_____/

**United States' Response Opposing
the Defendant's Motion for Compassionate Release**

Damario Tubbs-Smith dealt drugs while on federal supervised release for dealing drugs. Judge Battani sentenced him to jail on that violation. Within six months of getting out, Tubbs-Smith was caught driving with over 200 grams of cocaine and over 40 grams of crack cocaine in his pockets. That traffic stop formed the basis for the charges in this case, to which Tubbs-Smith pleaded guilty. Before (and while on bond for) his first federal case, Tubbs-Smith also committed state-level drug and firearms offenses.

1

This Court sentenced Tubbs-Smith to 10 years, the mandatory minimum. He began serving this sentence on June 21, 2019. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied. *First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. And while FCI Elkton is among the hardest-hit facilities, data shows that the situation is improving. Tubbs-Smith tested negative for Covid-19 on May 20.

*Second*, Tubbs-Smith does not satisfy the statutorily mandated criteria for compassionate release. Tubbs-Smith's offense and criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2). And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release for those same reasons. Tubbs-Smith has been relentlessly committing drug distribution and firearm-related crimes for over 10 years. No prior sentences of incarceration have deterred him.

## Background

On February 21, 2018, a Washtenaw County Sheriff Deputy pulled Tubbs-Smith over for driving with high beams on. Because Tubbs-Smith had an active felony warrant for a state drug case, and was driving with an expired plate, the Deputy arrested Tubbs-Smith.

While searching Tubbs-Smith, the Deputy felt a large bulge near his groin. He located two fist-size bags of powder cocaine in Tubbs-Smith's jeans. Another fist-size bag of crack cocaine fell to the ground as the Deputy shook the jeans. Cash also fell to the ground.

The crack cocaine weighed 42.02 grams, and the two bags of cocaine together weighed 231.36 grams. After the defendant's arrest, another Deputy searched the vehicle and found a loaded magazine for a .22 caliber gun and various items used to package drugs for sale, including sandwich bags, gloves, rubber bands, baking soda, corn starch, and a kilo press. Officers also located a crack pipe and a spoon with burned drug residue.

A grand jury charged Tubbs-Smith with possession with intent to distribute cocaine and possession with intent to distribute crack cocaine. Because the amount of crack cocaine was over 28 grams,

Tubbs-Smith faced a mandatory minimum sentence of five years. The government filed an information under 21 U.S.C. § 851, which increased his mandatory minimum to 10 years. This Court sentenced Tubbs-Smith to 10 years.

Tubbs-Smith began serving his prison sentence on June 21, 2019, and is currently incarcerated at FCI Elkton. He is 31 years old, and his projected release date is October 30, 2026. He has moved for compassionate release, citing his heart condition and the Covid-19 pandemic.

## Argument

### I. The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

#### A. The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a [detailed protocol](#) for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk

of Covid-19 transmission into and inside its facilities. *See* [BOP Covid-19 Modified Operations Website](). Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *See [id.]()* Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are also issued face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation]().

    Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

There is no question that FCI Elkton is one of the Bureau of Prisons facilities most affected by Covid-19. But the Bureau of Prisons has worked to mitigate the risk with increasing responses. A staff member from Medical Services tours housing units daily. Inmates who become ill after the regular sick call appointment sign up period may ask their work supervisor or Unit Officer to call the Health Service Unit for further instruction. Waterless soap dispensers have been placed in high volume, high risk areas. Social visits have been suspended and inmate telephone system minutes have been increased to 500 minutes per

calendar month. Legal visits have been suspended for 30 days, at which time the suspension will be re-evaluated. Case by case approval at the local level and confidential legal calls will be allowed in order to ensure access to counsel. Enhanced health screening of staff has been implemented in areas with "sustained community transmission" and at medical referral centers.

Data shows that the situation at Elkton is improving: the number of hospitalized inmates has been in decline from its April 8 peak of 46 inmates. *See* Declaration of Andrea Burnside, *Wilson v. Williams,* 4:20-cv-00794-JG, R. 98-2, PageID 1186. From April 12 through May 2, four inmates were hospitalized for Covid-19-related illness. (*Id.*). As of May 27, no other inmate had been hospitalized and only eight remained in the hospital. (*Id.*). Tubbs-Smith tested negative for Covid-19 on May 20.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

7

### B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 3,600 federal inmates have been granted home confinement since

8

the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-

9

confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. And if a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not

place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II. The Court should deny Tubbs-Smith's motion for compassionate release.

Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow. Tubbs-Smith must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

Even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at

12

sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. Tubbs-Smith is ineligible for compassionate release because he poses a danger to the community.

Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in [Program Statement 5050.50](). USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

13

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. *Raia*, 954 F.3d at 597. However, Tubbs-Smith's medical records confirm that he suffered from a heart attack at the age of 27. He also appears, based on the records, to have cardiomyopathies and/or pulmonary hypertension, which qualify as "serious heart conditions" according to CDC guidance. "Serious heart conditions" place individuals at a higher risk for severe illness from Covid-19. Though Tubbs-Smith receives medication and is monitored regularly for these conditions, the government does not dispute that Tubbs-Smith's medical conditions, combined with the Covid-19 pandemic, could qualify as extraordinary and compelling reasons for release.

But even if the combination of Tubbs-Smith's medical conditions and the Covid-19 pandemic satisfies the initial criteria for eligibility in USSG § 1B1.13 cmt. n.1, section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of

14

physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010) ("…our Court routinely affirms, on dangerousness grounds, the pre-trial detention of run-of-the-mill drug dealers, even without any indication that the defendant has engaged in violence."). So even many "non-violent" offenders may not be released under § 3582(c)(1)(A). USSG § 1B1.13(2). Here, Tubbs-Smith has not only been involved in significant and serial drug dealing, he has also possessed firearms in connection with that drug dealing—an unquestionably dangerous combination. He dealt drugs in 2008. (PSR ¶ 34). He maintained a drug house in 2009. (*Id.* at ¶ 35). In 2012, he was arrested for leaving a duffel bag in a hotel room—a duffel bag containing over 400 grams of cocaine, a handgun, and over 30 rounds of ammunition. (*Id.* at ¶ 36). A month later (while on bond), he attempted to flee from officers during a traffic stop and got caught with another handgun. (*Id.* at ¶ 37).

Tubbs-Smith continued committing crimes even on supervision. While on supervised release for the offense involving the duffel bag,

Tubbs-Smith was arrested with 84 grams of cocaine and 22 grams of crack cocaine. (*Id.* at ¶ 36). Less than six months after getting out of jail for that offense, he committed this offense.

Tubbs-Smith's dangerousness is evident in both the crimes he chooses to commit and his flouting of court-ordered supervision conditions. Because Tubbs-Smith's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). Tubbs-Smith is not eligible for compassionate release.

### B. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing

16

factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors).

First, the nature and circumstances of Tubbs-Smith's offense are serious—cocaine and crack cocaine are both highly addictive substances, and Tubbs-Smith was providing them to the community. Second, Tubbs-Smith's history and characteristics do not favor release. He has been consistently involved in drug distribution and firearms offenses since 2008. Third, Tubbs-Smith has not been deterred by past sentences of incarceration—and he has only served a small fraction of his sentence here. Time after time, he has gotten out of prison and gone back to selling drugs right away. Tubbs-Smith should be commended for participating in programming and education while in custody, but his history shows that he cannot be deterred from committing more crimes. So even if the Court were to find Tubbs-Smith eligible for compassionate release, the § 3553(a) factors should still disqualify him.

17

## III. If the Court were to grant Tubbs-Smith's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Tubbs-Smith's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Tubbs-Smith's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*s/Amanda Jawad*
Amanda Jawad
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9116
E-Mail: amanda.jawad@usdoj.gov

Dated: June 4, 2020

## Certificate of Service

I certify that on June 4, 2020, I electronically filed this response with the Clerk of the Court of the Eastern District of Michigan using the ECF system which will send notification of such filing to the following:

>Benton Martin
>Benton_Martin@fd.org
>Counsel for Defendant

>*s/Amanda Jawad*
>Amanda Jawad
>Assistant United States Attorney
>211 W. Fort Street, Suite 2001
>Detroit, MI  48226
>Phone:  (313) 226-9116
>E-Mail: amanda.jawad@usdoj.gov